**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Minnesota Life Insurance Company,
Advantus Capital Management, Inc., and
Securian Financial Group, Inc.,

    Plaintiffs,

v.

AXA Investment Mgr, Frederick Fritz
Feuerherm, and Wayne Schmidt,

    Defendants,

and

AXA Investment Mgr,

    Counter-Claimant,

v.

Minnesota Life Insurance Company,
Advantus Capital Management, Inc., and
Securian Financial Group, Inc.,

    Counter-Defendants,

and

Frederick Fritz Feuerherm and
Wayne Schmidt,

    Counter-Claimant,

v.

Minnesota Life Insurance Company,
Advantus Capital Management, Inc., and
Securian Financial Group, Inc.,

    Counter-Defendants.

Civil No. 03-4383 (DWF/SRN)

**MEMORANDUM**
**OPINION AND ORDER**

Daniel L. Scott, Esq., David M. Wilk, Esq., Kathleen M. Mahoney, Esq., Lawrence R. King, Esq., Sarah L. Beuning, Esq., and Stephen P. Laitinen, Esq., Larson King - St. Paul, counsel for Plaintiffs and Counter-Defendants Minnesota Life Insurance Company, Advantus Capital Management, Inc., and Securian Financial Group, Inc.

Quentin R. Wittrock, Esq., and Dean A. LeDoux, Esq., Gray Plant Mooty Mooty & Bennett - Minneapolis, counsel for Defendant and Counter-Claimant AXA Investment Mgr; Courtland C. Merrill, Esq., Richard T. Ostlund, Esq., and Mary L. Knoblauch, Esq., Anthony Ostlund & Baer, PA, counsel for Defendants and Counter-Claimants Frederick Fritz Feuerherm and Wayne Schmidt.

---

### Introduction

The above-entitled matter came before the undersigned United States District Judge on April 15, 2005, pursuant to the Motion for Preliminary Injunction and Motion for Summary Judgment on Defendants' Tortious Interference Counterclaims brought by Plaintiffs and Counter-Defendants Minnesota Life Insurance Company, Advantus Capital Management, Inc., and Securian Financial Group, Inc. (collectively "Plaintiffs") and the Motions for Summary Judgment brought by Defendants and Counter-Claimants AXA Investment Mgr. ("AXA"), Frederick Fritz Feuerherm, and Wayne Schmidt (collectively "Defendants"). For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' Motion for Preliminary Injunction and grants *in toto* Plaintiffs' Motion for Summary Judgment on Defendants' Tortious Interference Counterclaims. The Court also grants in part and denies in part Defendants' Motions for Summary Judgment.

### Background

Plaintiffs and Counter-Defendants Minnesota Life Insurance Company ("MN Life"), Advantus Capital Management, Inc., ("Advantus"), and Securian Financial Group, Inc. ("Securian") are interrelated companies. MN Life is a wholly-owned subsidiary of Securian and

is an affiliate of Advantus.  Advantus is MN Life's investment manager and is also a wholly owned subsidiary of Securian.

Defendant and Counter-Claimant AXA is a foreign corporation that is part of the AXA Group based in Paris, France.  AXA has an office in Hennepin County and does business in Minnesota.

Defendants and Counter-Claimants Feuerherm and Schmidt ("the Individual Defendants") once worked for Advantus, but now work for AXA.  Feuerherm was a member of Advantus' Board of Directors and was an officer of MN Life and Securian.  Schmidt was an officer of Advantus.  At Advantus, Feuerherm served as vice-president of investment strategy and Schmidt served as portfolio manager.  Both men worked in Advantus' Total Return Fixed Income Group ("the Total Return Group").  The Total Return Group managed bond portfolios for MN Life and other institutional clients.

In 2000, AXA made the decision to enter into the U.S. market.  Using the name "Western Track," AXA planned to buy a company that had an established track record in U.S. investments. AXA determined that it would be better to purchase an on-going concern rather than creating a new company to avoid the three- to five-year period it would take to grow the business and establish a track record.  A track record is the official performance of a fund over a period of years.  AXA referred to the period of time that it would lack a track record if it was not able to buy an on-going concern as the "credibility gap."

In order to implement Western Track, AXA hired a firm called Warren International to conduct a search for experienced fixed income investment professionals.  Jacob Navon, a headhunter for Warren International, led the search.  In spring 2003, Navon spoke with the

Individual Defendants about the possibility of the two of them leaving Advantus to come to work for AXA.  Both men told Navon that they were interested in the possibility of working for AXA.

Over the next few months, Feuerherm, Schmidt, and Navon discussed the possibilities of AXA and Advantus either partnering in a joint venture or of AXA buying Advantus' fixed income business.  During the course of these conversations, the Individual Defendants disclosed a great deal of information regarding Advantus and MN Life.  Feuerherm disclosed to Navon that MN Life had agreed to sell its equity business to Waddell & Reed before this information had been made available to the public.  The Individual Defendants also turned over information regarding the composition of the personnel that supported Advantus' total return team, the total return team's source of alpha,[1] client lists, revenue from clients, and performance data. Feuerherm and Schmidt assert that they believed the information they provided to AXA was not confidential.  Advantus contends that the information was confidential and that many of the documents that were provided to AXA were stamped "for internal use only."

Feuerherm claims that he believed a potential transaction involving AXA and Advantus would benefit both companies and the members of the Total Return Group.  Feuerherm asserts that he discussed a potential transaction involving AXA with senior executives at Advantus as early as mid-June 2003.  Advantus contends that the discussions between Feuerherm, Schmidt, and AXA were solely aimed at benefitting Feuerherm, Schmidt, and AXA at the expense of Advantus.  Advantus also claims that it was not aware that discussions were taking place between Feuerherm, Schmidt, and AXA until AXA was prepared to make an offer to Advantus.

---

[1]     "Alpha" refers to the ability to add value over a benchmark.

On April 26, 2003, Schmidt urged AXA to make offers of employment to Feuerherm, Kent Weber, and Steve Nelson, and himself (collectively "the former Advantus employees"). Weber and Nelson were also members of the Total Return Group.  In May 2003, Feuerherm advised AXA that Advantus would likely sell its fixed income division to AXA if Feuerherm, Schmidt, Weber, and Nelson were hired by AXA.

On June 18, 2003, the Individual Defendants traveled to Paris to meet with AXA representatives to discuss AXA's proposal regarding the purchase of Advantus' fixed income division.  Neither of the Individual Defendants informed Advantus of the purpose of this trip. While meeting with AXA representatives, the Individual Defendants signed confidentiality agreements.

On June 23, 2003, Feuerherm met with Robert Senkler, the Chairman, Chief Executive Officer, and President of MN Life and Securian.  Feuerherm told Senkler that AXA was prepared to make an offer to buy Advantus' fixed income division.  Feuerherm also gave Senkler background information about AXA and its representatives.  At this meeting, Senkler agreed to meet with AXA on July 1.

On July 1, 2003, Advantus and AXA representatives met to discuss AXA's proposal. AXA proposed a purchase of Advantus' fixed income division rather than a joint venture between the two parties.  Senkler agreed to get back to AXA within two weeks.

On July 10, 2003, Senkler offered Schmidt, Weber, and Nelson significant increases in pay if they remained at Advantus.  Senkler also offered to strengthen the business to meet Feuerherm's expectations.

5

On July 15, 2003, Senkler notified AXA and the total return group that Advantus was rejecting AXA's proposal.  Later, Feuerherm, Schmidt, Weber, and Nelson resigned from Advantus.  On July 31, 2003, this suit was filed against AXA, Feuerherm, and Schmidt alleging: (1) misappropriation of confidential information; (2) violation of the Minnesota Deceptive Trade Practices Act and the Lanham Act; (3) breach of fiduciary duty; (4) breach of duty of loyalty; (5) unfair competition; (6) misappropriation of trade secrets; (7) tortious interference with business advantage; (8) tortious interference with contractual relations; and (9) conversion and civil liability for theft.  Plaintiffs request both money damages and injunctive relief.

Plaintiffs contend that they have suffered millions of dollars in damages as a result of Defendants' alleged wrongdoing.  Plaintiffs assert they have suffered three types of damages.  First, Plaintiffs contend that they lost business for a roughly three-year period because analysts are wary of recommending a firm that has lost senior management or employees.  In addition, Plaintiffs assert that they were not selected for any of the bids for which they were finalists.

Second, Plaintiffs contend that Defendants have been unjustly enriched by their use of Advantus' trade secrets and confidential information and their use of Advantus' track record.  Plaintiffs contend that AXA's use of the Advantus track record has allowed AXA to land several large accounts.

Third, Plaintiffs assert that they have incurred certain costs as a result of Defendants' alleged misconduct.  These costs allegedly include the ability to invest in a product that was being created by Feuerherm, restaffing costs, and additional client costs.

Defendants contest each of Plaintiffs' claims.  In addition, Defendants brought counterclaims against Plaintiffs for tortious interference alleging that Plaintiffs' claims are baseless and without merit.

## Discussion

### I.      Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

II.     **Defendants' Motions for Summary Judgment**

    A.     **Misappropriation of Confidential Information (Count I) and
                Trade Secrets (Count VI)**

In order to establish claims for misappropriation of confidential information and trade secrets, a plaintiff must show that:  (1) the information is not generally known or ascertainable; (2) the information provides a demonstrable competitive advantage; and (3) the information was subject to reasonable efforts to maintain its secrecy.  *Cherne Indus., Inc. v. Grounds & Assoc., Inc.,* 278 N.W.2d 81, 92-93 (Minn. 1979) (stating the standard for common law misappropriation of confidential information claims); *Strategic Directions Group, Inc. v. Bristol-Meyers Squibb Co.,* 293 F.3d 1062, 1064-65 (8th Cir. 2002) (stating the standard for Minnesota Uniform Trade Secrets Act claims).

Plaintiffs have identified four categories of information that Defendants allegedly have misappropriated, including:  (1) financial and client information; (2) marketing information; (3) operational information; and (4) information the Individual Defendants allegedly provided to AXA to assist it in negotiations with Plaintiffs.  Plaintiffs claim that all of this information is subject to protection and that they took reasonable efforts to protect the information.  Plaintiffs claim three types of damages with regard to this claim and the other claims found in their Amended Complaint:  (1) lost profit; (2) unjust enrichment on the part of Defendants; and (3) additional administrative and business costs.

Defendants do not deny that certain information was given to AXA by the Individual Defendants.  Instead, Defendants contend that none of the information is entitled to protection as it is both readily ascertainable to the general public and Plaintiffs did not take reasonable measures to ensure its secrecy.  AXA also claims that it did not know or have reason to know

that the information was obtained by improper means or without the Plaintiffs' consent.  Finally,

Defendants claim that Plaintiffs have not been able to show that they were damaged in any way

by AXA's use of the information or that AXA has been unjustly enriched by its access to this

information.

The Court finds that Plaintiffs have demonstrated that AXA was provided information by

the Individual Defendants.  While the Court questions whether much of the information

transferred to AXA is entitled to protection, the Court does find that genuine issues of material

fact remain with regard to whether the information was readily ascertainable and subject to

reasonable measures of protection.  The Court also questions the damages, if any, that Plaintiffs

suffered as a result of the transfer of this information.  Plaintiffs assert that the transfer of

information alone led to Advantus' lost profits.  The Court finds this position to be extremely

tenuous.  Nonetheless, the Court finds that Plaintiffs have presented sufficient evidence of

damages such that fact issues remain with regard to this count of the Amended Complaint.

### B.    Violation of the Minnesota Deceptive Trade Practices Act and the Lanham Act (Count II)[2]

Plaintiffs contend that a July 22, 2003, press release, a document prepared along with that

press release ("the Q&A"), and "pitch books" prepared by AXA violate the Lanham Act and the

Minnesota Deceptive Trade Practices Act ("MDTPA").[3]  To establish a Lanham Act or MDTPA

claim, a plaintiff must demonstrate that:  (1) the defendant made a false statement of fact in a

---

[2]    Plaintiffs' Motion for Preliminary Injunction is tied to these claims.  Thus, the Court will consider both Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion for Summary Judgment together.

[3]    Pitch books are advertising materials containing information about a particular business entity sent to prospective customers by the business entity to solicit business.

9

commercial advertisement about its own or another's product; (2) the statement actually

deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception

is material; (4) the defendant caused its false statement to enter into interstate commerce; and (5)

plaintiff has been or is likely to be injured as a result of the false statement.  *United Indus. Corp.*

*v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir. 1998).  In addition, to recover money damages

under the Lanham Act, a plaintiff must prove both actual damages and a causal link between a

defendant's actions and those damages.  *Id.*

The false statement necessary to establish a Lanham Act violation generally falls into one

of two categories:  (1) commercial claims that are literally false as a factual matter; and

(2) claims that may be literally true or ambiguous but which implicitly convey a false

impression, are misleading in context, or are likely to deceive consumers.  *Id.* (citing *Southland*

*Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir. 1997)).  In this case, Plaintiffs

contend that each of the documents previously mentioned unlawfully linked the former Advantus

employees' work performance to the performance of Advantus' fixed income division.

AXA released a press release on June 22, 2003, discussing its hiring of the former

Advantus employees and describing the former Advantus employees' success while at Advantus.

The press release stated that the former Advantus employees had "produced a consistently strong

track record of performance."  (Affidavit of David M. Wilk ("Wilk Aff."), ¶ 73, Ex. 75, at 1.)[4]

The press release also provided that the former Advantus employees "have demonstrated a

proven ability and track record . . . ."  (*Id.*)  The Q&A booklet that was issued with the press

---

[4]        Plaintiffs incorrectly delineated their exhibit numbers on the Wilk Affidavit.
Accordingly, the Court will cite to the actual exhibit numbers rather than the erroneous numbers
contained in the affidavit.

release also contained statements attributing Advantus' track record to the former Advantus

employees.

AXA also produced a number of pitch books that it provided to prospective clients.  The

pitch books purported to provide a one-, three-, and five-year performance history for AXA's

fixed income division.  The pitch books showed Advantus' track record up until September 30,

2003, even though the former Advantus employees left the company one month earlier.  The

pitch book also contained an "Important Disclosure Regarding Past Performance Data."  (Wilk

Aff., ¶ 79, Ex. 81, at 2.)  The disclosure stated that the former Advantus employees were

"assisted by a team of analysts and others" and that the Advantus team would be the group

handling client accounts at AXA.  (*Id.*)

### 1.      Literally False Claims

If a plaintiff is able to prove that a claim is literally false, a court may grant relief without

considering whether the buying public was actually misled; the plaintiff need not prove actual

consumer confusion.  *United Indus.,* 140 F.3d at 1180.  In determining whether a claim is

literally false, a court must examine the message conveyed within its full context.  *Id.* (citing

*Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.,* 93 F.3d 511, 516 (8th

Cir. 1996)).

In examining whether AXA's use of Advantus' track record is false or misleading, the

Court will consider the portability requirements of the Securities & Exchange Commission

("SEC") and the CFA Institute, formerly known as the Association for Investment Management

and Research ("AIMR").  *See Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.,* 83 F. Supp. 2d

1016, 1022 n.2 (D. Minn. 2000) (citing *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,* 902 F.2d

222, 230 (3rd Cir. 1990)).  While the Court considers these portability requirements, the burden is

still on Plaintiffs to prove that the advertising is false and misleading.  *Id.*

The SEC's rules state that a registered investment company may not advertise the

performance of accounts managed by its portfolio manager at a predecessor firm if other

individuals played a significant role in achieving that record.  15 U.S.C. § 80b-6(4).  CFA

Institute has also set forth portability standards.  Generally, CFA Institute standards require that

a firm's investment decision-making processes remain substantially unchanged in order for a

new firm to claim a prior firm's performance record.  AIMR-PPS Standard 5.A.4.

After reviewing the record, the Court finds that AXA's statements regarding the former

Advantus employees' track record are literally false as the statements are presented in the

June 22, 2003, press release and the accompanying Q&A booklet.  The SEC and CFA Institute

place significant restrictions on the ability of firms to use performance records generated by their

employees at their former places of business.  As previously stated, the Court considers these

standards in determining whether a statement or statements are false.  In this case, the Court

finds that AXA has not complied with the SEC and CFA Institute guidelines with regard to the

above-referenced documents.  Further, the Court finds that these statements are literally false

insofar as they suggest to potential customers that the former Advantus employees were solely

responsible for the performance of Advantus' fixed income division.

While the Court finds that the statements in the press release and Q&A booklet were

literally false, the Court finds that those same claims are neither literally false nor misleading as

presented in the pitch books.  In contrast to the press release and the Q&A booklet, the pitch

books contain a disclosure that explicitly sets out that the former Advantus employees were assisted while at Advantus by a team of additional individuals.

Plaintiffs contend that the disclosure is not conspicuous and is ambiguous concerning the role played by other members of Advantus' fixed income division in the development of Advantus' track record.  The Court finds that the disclosure is sufficient to clarify AXA's statements regarding the former Advantus employees' past performance.  Thus, the Court finds that summary judgment is appropriate with regard to Plaintiffs' Lanham Act and MDTPA claims insofar as the claims arise out of the pitch books.  However, the Court's ruling on this issue is limited in context to the claims before the Court.  The SEC, CFA Institute, or other governmental and non-governmental entities may determine that additional action need to be taken with regard to AXA's pitchbooks.

### 2.        Statement Actually Deceived or has the Tendency to Deceive

Plaintiffs must also establish that the statements contained in the press release and Q&A booklet were actually or likely deceptive.  Plaintiffs can do so by showing that Defendants' statements were either:  (1) literally false; or (2) likely to mislead or confuse consumers.  *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.,* 966 F. Supp. 1250, 1268 (D. D.C. 1997).  Here, literal falsity has been shown.

A plaintiff's burden in a Lanham Act case is, in part, dependent on the relief the plaintiff seeks.  A plaintiff that wishes to recover money damages for a violation of the Lanham Act and related state statutes must establish actual confusion among the consumers of the plaintiff's products, actual injury, and a causal connection between the confusion and the injury.  *Lenscrafters, Inc. v. Vision World, Inc.,* 943 F. Supp. 1481, 1489 (D. Minn. 1996).  In light of the

Court's finding that the statements made in the press release and the Q&A booklet were literally false, the Plaintiffs need not make a showing of consumer confusion.  *Ott v. Target Corp.,* 153 F. Supp. 2d 1055, 1072 (D. Minn. 2001).

When a plaintiff seeks only injunctive relief, however, it need only prove a likelihood of confusion among consumers that has resulted from defendants' actions.  *Id.*  In addition, where a defendant has engaged in literally false advertising, the Court will presume that the plaintiff has suffered injury that warrants injunctive relief.  *Id.*  In this case, Plaintiffs seek both money damages and injunctive relief.

The Court has considered this issue and finds that Plaintiffs have not been able to establish actual confusion among consumers resulting from AXA's press release and Q&A booklet.  Nonetheless, the Court finds that granting summary judgment solely on the damages issue would be inappropriate at this time.  *See Slidell, Inc. v. Millennium Inorganic Chem., Inc.,* No. Civ. 02-213 (JRT/FLN), 2004 WL 1447921, at *4 (D. Minn. June 28, 2004).  Instead, the issue would be better considered in the form of a motion *in limine* at some later time.

Based on the Court's finding that AXA engaged in literally false advertising, the Court finds that it need not consider the remaining Lanham Act and MDTPA elements in order to grant Plaintiffs injunctive relief.  Specifically, the Court finds that AXA may not link Advantus' track record to itself or the former Advantus employees without an appropriate and conspicuous disclosure.  The Court acknowledges that this remedy might not be sufficient in light of SEC or CFA Institute standards, but finds that the remedy is sufficient in relation to the Lanham Act and MDTPA claims before the Court.

**C.      Breach of Fiduciary Duty (Count III) and Duty of Loyalty (Count IV)**

Corporate officers and directors owe fiduciary duties to their employers.  *Westgor v. Grimm,* 318 N.W.2d 56, 58 (Minn. 1982).  The fiduciary duty requires officers and directors "to act in good faith, with honesty in fact, with loyalty, in the best interests of the corporation." *Writers, Inc. v. West Bend Mut. Ins. Co.,* 465 N.W.2d. 419, 423 (Minn. Ct. App. 1991).  A claim for breach of fiduciary duty requires a showing of four elements:  (1) the existence of a duty; (2) breach of that duty: (3) causation; and (4) damages.  *Storage Tech. Corp. v. Cisco Sys., Inc.,* No. Civ. 00-2253 (JNE/JGL), 2003 WL 22231544, at *10 (D. Minn. Sept. 25, 2003).

Plaintiffs contend that the Individual Defendants violated their fiduciary duties to Advantus.  Specifically, Plaintiffs assert that the Individual Defendants provided Advantus' confidential information to AXA.  Plaintiffs also claim that the Individual Defendants assisted AXA in preparing its bid to buy Advantus' fixed income division.  Plaintiffs claim that each of these acts was against Plaintiffs' interests.  Plaintiffs assert that they have suffered millions of dollars in losses as a result of the Individual Defendants' breaches of their fiduciary duties.

The Individual Defendants dispute that they had any fiduciary duties to Defendants or that either of them violated any alleged duties.  Nonetheless, the Individual Defendants assert that the Court need not consider these issues as Plaintiffs have failed to submit any evidence of damages resulting from these alleged breaches.  The Individual Defendants assert that any confidential information transferred to AXA was done in the best interests of Plaintiffs and did not result in any damages to Plaintiffs.  Further, the Individual Defendants contend that the former Advantus employees were free to leave at any time and as such the business disruption that occurred would have happened even in the absence of any alleged breach.

15

The Court finds that summary judgment is not appropriate as to Plaintiffs' breach of fiduciary duty and loyalty claims.  As previously discussed, the Court finds that some of Plaintiffs' business information was transferred to AXA by the Individual Defendants.  Plaintiffs have also made a showing that the Individual Defendants assisted AXA in preparing its bid to buy Advantus' fixed income division.  Although the Court agrees with Defendants that some of Plaintiffs' damages claims are extremely tenuous, the Court finds that Plaintiffs have presented sufficient evidence of damages such that summary judgment is inappropriate.

### D.    Unfair Competition (Count V)

Unfair competition is not a tort with specific elements, but instead describes a general category of torts that courts recognize to protect commercial interests.  *Rehab. Specialists, Inc. v. Koering,* 404 N.W.2d 301, 305-06 (Minn. Ct. App. 1987).  Unfair competition can cover claims such as tortious interference with contract, misuse of trade secrets, and an employee's breach of their fiduciary duties.  *See id.*  However, a claim that asserts nothing more than misappropriation or misuse of a trade secret is displaced by the Minnesota Trade Secrets Act.  *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC,* 292 F. Supp. 2d 1173, 1179-80 (D. Minn. 2003).

Plaintiffs contend that they have a viable unfair competition claim that is not duplicative of their trade secrets claims.  Plaintiffs assert that their unfair competition claims cover not only Defendants' actions regarding trade secrets, but also AXA's use of Advantus' track record and AXA's actions in "lifting out" the former Advantus employees.  Plaintiffs describe their unfair competition claim as covering Defendants' overall approach to competition.  Defendants contend that Plaintiffs' unfair competition is nothing but a trade secrets claim.  Thus, Defendants assert that it must be disposed of as duplicative of the Minnesota Trade Secrets Act.

After reviewing Plaintiffs' Amended Complaint, the Court finds that Plaintiffs' unfair competition claim is duplicative of the Minnesota Trade Secrets Act. Plaintiffs attempt to broaden the scope of their claim but the claim remains essentially focused on the trade secrets issues. Thus, the Court finds that summary judgment is appropriate with regard to this claim.

### E.      Tortious Interference with Business Advantage (Count VII)

In order to establish a tortious interference with prospective business relations claim, a plaintiff must show that a defendant intentionally and improperly interfered with Plaintiffs' prospective business relations. *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn. 1982). The interference may come about by a defendant inducing a third-party not to enter into or to continue a prospective relation. *Id.*

Plaintiffs assert that the Individual Defendants coerced AXA to open an office in Minneapolis by providing AXA with Advantus' confidential information. Plaintiffs contend that the former Advantus employees would not have left Advantus without this exchange of information because the former Advantus employees enjoyed living in the Twin Cities area. Plaintiffs claim that they lost one client directly to AXA, lost three clients as a result of the former Advantus employees leaving the company, and lost numerous prospective clients as a result of the mass resignation of its employees.

Defendants assert that this claim is duplicative of Plaintiffs' Minnesota Uniform Trade Secrets Act claim and, therefore, must be dismissed. Defendants point to the fact that the sole allegation in Plaintiffs' Complaint with regard to this claim is that Defendants "wrongfully obtain[ed] plaintiffs' trade secrets and confidential proprietary information." (Am. Compl. at ¶ 113.)

17

After reviewing Plaintiffs' Amended Complaint and the rest of the record, the Court finds

that Plaintiffs' tortious interference with business advantage claim is duplicative of their

Minnesota Uniform Trade Secrets Act claim.  Plaintiffs attempt to broaden the scope of their

tortious interference with business advantage claim, but it is clear from the Amended Complaint

that the trade secrets issue is at the root of this claim.  Accordingly, the Court finds that summary

judgment in favor of Defendants is appropriate with regard to this claim.

### F.      Tortious Interference with Contract (Count VIII)

In order to prevail on a tortious interference with contract claim, the plaintiff must

demonstrate the existence of a contract, the alleged wrongdoer's knowledge of the contract, and

an intentional procurement of its breach, without justification, that results in damage to the

plaintiff.  *See Maness v. Star-Kist Foods, Inc.*, 7 F.3d 704, 709 (8th Cir. 1993) (citing *Furlev*

*Sales and Assocs., Inc. v. North American Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn.

1982)).

Plaintiffs assert that AXA tortiously interfered with the contracts of Plaintiffs' employees

and clients.  Plaintiffs contend that AXA interfered with Plaintiffs' employee contracts by

inducing its employees to breach their fiduciary duties to Plaintiffs.  Specifically, Plaintiffs claim

that AXA offered the former Advantus employees positions with AXA if they provided AXA

with confidential information and assisted AXA in negotiations between AXA and Advantus.

Plaintiffs assert that AXA was, or should have been, aware that engaging the Individual

Defendants in these actions would cause the Individual Defendants to breach their fiduciary

duties to Plaintiffs.  Plaintiffs also contend that AXA tortiously interfered with the contracts of

Plaintiffs' clients.

AXA claims that it did not interfere with the at-will employment contracts of the former Advantus employees.  AXA asserts that the former Advantus employees did nothing more than prepare to enter into competition with Plaintiffs while they were employed at Advantus.  The Individual Defendants claim that they did not breach their fiduciary duties to Plaintiffs and AXA asserts that it is unaware of any such violations if they did occur.

Defendants also contend that they did not interfere with the contracts of Plaintiffs' clients.  Defendants claim that the only client Plaintiffs lost to AXA was an at-will client that chose to transfer its business to AXA after the former Advantus employees left the company.  AXA contends that it secured the contract with this client without interfering in any way with the contract between Advantus and its former client.  Defendants contend that any prospective clients that Plaintiffs assert were lost were not under contract with Plaintiffs at the time.  Thus, Defendants contend that Plaintiffs' claim fails because there were no contracts to interfere with and Plaintiffs cannot show that, but for AXA, Plaintiffs would have been able to turn these prospects into clients.

The Court finds that Defendants are not entitled to summary judgment as to the portion of Plaintiffs' claim regarding employment contracts, but that summary judgment is appropriate as to the client contract allegations.  As previously discussed, the Court finds that genuine issues of material fact exist regarding the trade secret and breach of fiduciary duty claims.  A viable tortious interference with contract claim can arise out of a breach of fiduciary duty claim.  *See Storage Tech. Corp. v. Cisco Sys., Inc.,* 395 F.3d 921, 925 (8th Cir. 2005).  After reviewing the record, the Court finds that genuine issues of material fact exist with regard to this claim.

The Court comes to a different conclusion with regard to Plaintiffs' allegations regarding interference with client contracts.  The Court finds that Plaintiffs have not been able to provide the Court with evidence that any of their existing clients breached their contracts with Advantus as a result of the mass-resignation.  Further, Plaintiffs have not presented evidence that any of the prospective clients would have contracted with Plaintiffs "but for" AXA's actions.  *North Central Co. v. Phelps Aero, Inc.,* 139 N.W.2d 258, 263 (Minn. 1965).  Thus, summary judgment is appropriate as to the client contract portion of this claim.

### G.  Conversion and Civil Liability for Theft (Count IX)

Under Minnesota law, conversion is defined as "an act of willful interference with the personal property of another which is without justification or which is inconsistent with the rights of the person entitled to the use, possession or ownership of the property."  *Bloom v. Hennepin County,* 783 F. Supp. 418, 440 (D. Minn. 1992) (quoting *Dain Bosworth, Inc. v. Goetze,* 374 N.W.2d 467, 471 (Minn. Ct. App. 1985)).  Conversion may involve "tangible property, or intangible property customarily merged in, or identified with some document."  *Id.*

Plaintiffs contend that Defendants have wrongfully made use of Advantus' trade secrets and track record.  Plaintiffs assert that Defendants' use of Advantus' trade secrets and track record constitutes conversion.  In contrast, Defendants claim that Advantus' track record is not personal property.  Defendants also contend that they have not exercised dominion over Advantus' track record in such a way as to repudiate Plaintiffs' rights in the track record or deprived Plaintiffs of its possession of the track record.

The Court finds that Defendants are entitled to summary judgment on this claim.  Insofar as Plaintiffs argue this claim is based on the alleged misuse of Plaintiffs' trade secrets, the claim

20

would appear to be duplicative of the Minnesota Trade Secrets Act.  Notwithstanding the Court's

finding that the claim is likely duplicative, the Court finds that the trade secrets and the track

record at issue are "not the types of intangible property traditionally subject to conversion . . . ."

*See Bloom,* 783 F. Supp. at 441.  Thus, the Court grants summary judgment as to Plaintiffs'

conversion and civil theft claims.

## III.    Plaintiffs' Motion for Summary Judgment

Defendants have brought tortious interference counterclaims against Plaintiffs asserting

that Plaintiffs' lawsuit is without merit and has been brought solely for the purpose of limiting

Defendants' business prospects.  Plaintiffs contend that their filing of this suit is protected under

the *Noerr-Pennington* doctrine.  In *Eastern Railroad Presidents Conference v. Noerr Motor*

*Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381

U.S. 657 (1965), the Supreme Court established that the First Amendment right to petition

includes a litigant's right to bring suit in state or federal court.  Under the *Noerr-Pennington*

doctrine, the act of filing a lawsuit is immune from antitrust or tort liability unless it is found to

be a mere sham intended to disguise tortious or anti-competitive liability.  *Noerr*, 365 U.S. at

140.  In the Eighth Circuit, this exception has been further defined as follows:

> It is only where a defendant's resort to the courts is accompanied or characterized
> by illegal and reprehensible practices such as perjury, fraud, conspiracy with or
> bribery of government decision makers, or misrepresentation, or is so clearly
> baseless as to amount to an abuse of process, that the *Noerr-Pennington* cloak of
> immunity provides no protection.  . . .  Thus the filing of suit will fit within the
> "sham exception," and will give rise to tort liability, only if "clearly baseless," or
> if accompanied by perjury, fraud, conspiracy, bribery, misrepresentation, or other
> "illegal and reprehensible practices."

*Surgidev Corp. v. Eye Tech., Inc.*, 625 F. Supp. 800, 803 (D. Minn. 1986) (following *Razorback*

*Ready Mix Concrete Co., Inc. v. Weaver*, 761 F.2d 484 (8th Cir. 1985)) (citations omitted).  *See*

*also Lund Indus., Inc. v. Westin, Inc.*, 764 F. Supp. 1342, 1345 (D. Minn. 1990) (following same authority).  If a court finds a lawsuit to be objectively baseless or without probable cause, then the court may look to the subjective motivation of the party bringing suit to determine whether liability should attach.  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59 (1993).  While the *Noerr-Pennington* doctrine arose in the context of the Sherman Act and antitrust litigation, the doctrine has been appropriately adopted by courts to apply in other contexts as well.

The Court has reviewed the record and finds that Plaintiffs' suit is neither "objectively baseless," nor "subjectively motivated to harm" Defendants.  *Prof'l Real Estate Investors*, 508 U.S. at 59.  As previously discussed, the Court has granted Plaintiffs injunctive relief with regard to their Motion for Preliminary Injunction and has denied summary judgment on several of Plaintiffs' claims.  In light of the Court's findings with regard to these claims, the Court finds that summary judgment is appropriate on Defendants' counterclaims.

## Conclusion

Although the Court has denied summary judgment with regard to some of Plaintiffs' claims, the Court believes that Plaintiffs will have a difficult task in convincing a jury of at least some of their claimed damages.  Thus, the Court believes it is in the best interests of the parties to negotiate a resolution of this dispute.  As the parties are aware, Magistrate Judge Susan Richard Nelson remains available to assist in the negotiation of a settlement should the parties find such services to be helpful.  If the Court may be of assistance in this matter, the parties should contact Lowell Lindquist, Calendar Clerk for Judge Donovan W. Frank, at 651-

848-1296, or Beverly Riches, Calendar Clerk for Magistrate Judge Susan Richard Nelson, at
651-848-1200.

For the reasons stated, **IT IS HEREBY ORDERED:**

1.      The Motion for Preliminary Injunction (Doc. No.127) brought by Plaintiffs and
Counter-Defendants Minnesota Life Insurance Company, Advantus Capital Management, Inc.,
and Securian Financial Group, Inc. is **GRANTED**, as follows:

      a.      Defendants and Counter-Claimants AXA Investment Mgr.,
Frederick Fritz Feuerherm, and Wayne Schmidt are enjoined from making
commercial statements linking Advantus' track record to themselves without an
appropriate and conspicuous disclosure concerning the role played by other
members of Advantus' fixed income division in the development of Advantus'
track record.

2.      The Motions for Summary Judgment (Doc. Nos. 155 and 162) brought by
Defendants and Counter-Claimants AXA Investment Mgr., Frederick Fritz Feuerherm, and
Wayne Schmidt are **GRANTED IN PART AND DENIED IN PART,** as follows:

      a.      The Motions for Summary Judgment brought by Defendants and
Counter-Claimants AXA Investment Mgr., Frederick Fritz Feuerherm, and
Wayne Schmidt are **GRANTED** as to Counts V (Unfair Competition), VII
(Tortious Interference with Business Advantage), and IX (Conversion and Civil
Liability for Theft).

      b.      The Motions for Summary Judgment brought by Defendants and
Counter-Claimants AXA Investment Mgr., Frederick Fritz Feuerherm, and

Wayne Schmidt are **DENIED** as to Counts I (Misappropriation of Confidential Information), III (Breach of Fiduciary Duty), IV (Breach of Duty of Loyalty), and VI (Misappropriation of Trade Secrets).

      c.      The Motions for Summary Judgment brought by Defendants and Counter-Claimants AXA Investment Mgr., Frederick Fritz Feuerherm, and Wayne Schmidt are **GRANTED** as to the claims in Count II (Lanham Act and Minnesota Deceptive Trade Practices Act) regarding the pitchbooks, but are **DENIED** as to the claims regarding the press release and Q&A booklet.

      d.      The Motions for Summary Judgment brought by Defendants and Counter-Claimants AXA Investment Mgr., Frederick Fritz Feuerherm, and Wayne Schmidt are **GRANTED** as to the claims in Count VIII (Tortious Interference with Contract) regarding the customer contracts, but are **DENIED** as to the claims regarding employee contracts.

      3.      The Motion for Summary Judgment (Doc. No. 150) brought by Plaintiffs and Counter-Defendants Minnesota Life Insurance Company, Advantus Capital Management, Inc., and Securian Financial Group, Inc. is **GRANTED.**


Dated:  June 22, 2005         s/Donovan W. Frank
                      DONOVAN W. FRANK
                      Judge of United States District Court